IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MATZ JOHANSSON, on behalf of himself and all others similarly situated, | : | Civil Action No. 1:14-cv-00042-GMS |
| | : | (Securities Class Action) |
| Plaintiff, | | |
| | : | Hon. Gregory M. Sleet |
| v. | | |
| | : | ELECTRONICALLY FILED |
| LOUIS FERRARI, GINGER CONSTANTINE, M.D., STEPHEN O. JAEGER, DAVID P. MEEKER, M.D., DAVID Y. NORTON, ROBERT G. SAVAGE, VIRGIL THOMPSON, RICHARD CROWLEY, JOHN P. HAMILL, PHILIP K. YACHMETZ, AND DAVID G. GIONCO, | : | Oral Argument Requested |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

OF COUNSEL:

James R. Carroll
Alisha Q. Nanda
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Tel.: (617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com

Robert S. Saunders
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 North King Street, 7th Floor
Wilmington, Delaware 19801
Tel.: (302) 651-3000
Fax: (302) 651-3001
rob.saunders@skadden.com

*Counsel for Defendants
Louis Ferrari, Ginger Constantine, M.D.,
Stephen O. Jaeger, David P. Meeker, M.D.,
David Y. Norton, Robert G. Savage, Virgil
Thompson, Richard Crowley, John P. Hamill,
Philip K. Yachmetz, and David G. Gionco*

DATED: July 23, 2014

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................................1

SUMMARY OF FACTUAL ALLEGATIONS ...............................................................................3

    A.    Savient And The Parties ..................................................................................3

    B.    April 1, 2013:  Savient Disclosed Substantial Risks In Its Form 10-K ..................4

    C.    May 15, 2013:  Savient Disclosed Substantial Risks In Its Form 10-Q .................5

    D.    August 14, 2013:  Savient Disclosed Substantial Risks In Its Form 10-Q .............6

    E.    October-December 2013:  Savient Announced Bankruptcy And Sale Process .......8

ARGUMENT ...............................................................................................................................8

I.    PLAINTIFF'S SECTION 10(B) CLAIM
IS SUBJECT TO HEIGHTENED PLEADINGS STANDARDS ......................................8

II.    PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE
MATERIAL MISREPRESENTATION OR OMISSION ...................................................9

    A.    Savient's Cash Projections Were Not False Or Misleading ..................................9

    B.    Savient's Cash Projections Fall Within The PSLRA's Safe Harbor ......................11

        1.    Savient's Cash Projections Were Forward-Looking .................................12

        2.    Savient's Cash Projections Were
Accompanied By Meaningful Cautionary Statements..............................13

        3.    Savient's Cash Projections Did Not Significantly Alter
The Total Mix Of Information And Thus Were Immaterial .....................14

        4.    Savient's Cash Projections Were Not Made
With Actual Knowledge Of Their Alleged Falsity ..................................16

    C.    Under The PSLRA There Was No Duty To
Update Savient's Forward-Looking Cash Projections ..........................................16

    D.    There Was No Duty To Affirmatively Disclose Details
About The Board's Evaluation Of Potential Strategic Alternatives ......................17

III.      PLAINTIFF FAILS TO ALLEGE WITH PARTICULARITY
FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER..........................20

      A.      Plaintiff's Conclusory "Scienter Allegations" Amount
To Impermissible Group Pleading And Should Be Rejected.................................21

      B.      A Strong Inference Of Scienter Cannot
Be Inferred From Savient's Cash Projections ........................................................22

      C.      A Strong Inference Of Scienter Cannot Be Inferred
From Savient's Reference To Strategic Alternatives..............................................24

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)......................................................................................21

Backman v. Polaroid Corp.,
    910 F.2d 10 (1st Cir. 1990)........................................................................17

Bartesch v. Cook,
    941 F. Supp. 2d 501 (D. Del. 2013)......................................................21, 22

Beleson v. Schwartz,
    599 F. Supp. 2d 519 (S.D.N.Y. 2009)..............................................1, 19, 20

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)....................................................................................21

Bonomo v. Nova Fin. Holdings Inc.,
    Civ. A. No. 11-4762, 2012 WL 2196305 (E.D. Pa. June 15, 2012) .................17

Brody v. Transitional Hosps. Corp.,
    280 F.3d 997 (9th Cir. 2002) ......................................................................17

Building Trades United Pension Trust Fund v. Kenexa Corp.,
    No. 09-2642, 2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) ............................13

Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,
    394 F.3d 126 (3d Cir. 2004)........................................................................10

City of Edinburgh Council v. Pfizer Inc.,
    No. 13-2314, 2014 WL 2535383 (3d Cir. June 6, 2014) ..................................18

City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.,
    686 F. Supp. 2d 404 (D. Del. 2009)............................................................22

In re Advanta Corp. Sec. Litig.,
    180 F.3d 525 (3d Cir. 1999)......................................................10, 13, 17, 22

In re Aetna, Inc. Sec. Litig.,
    617 F.3d 272 (3d Cir. 2010)................................................................ *passim*

In re Alpharma Inc. Sec. Litig.,
    372 F.3d 137 (3d Cir. 2004)........................................................................20

**CASES**                                                                   **PAGE(S)**

In re Burlington Coat Factory Sec. Litig.,
     114 F.3d 1410 (3d Cir. 1997)................................................................17

In re NAHC, Inc. Sec. Litig.,
     306 F.3d 1314 (3d Cir. 2002)..............................................................10

In re Party City Sec. Litig.,
     147 F. Supp. 2d 282 (D.N.J. 2001) ....................................................13

In re Rockefeller Ctr. Props., Inc. Sec. Litig.,
     311 F.3d 198 (3d Cir. 2002)................................................................22

In re Tower Auto. Sec. Litig.,
     483 F. Supp. 2d 327 (S.D.N.Y. 2007)................................................20

L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.,
     921 F. Supp. 1174 (S.D.N.Y. 1996) ..................................................20

Oran v. Stafford,
     226 F.3d 275 (3d Cir. 2000)................................................................18

Rahman v. Kid Brands, Inc.,
     736 F.3d 237 (3d Cir. 2013)..................................................... *passim*

Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.,
     No. 12-cv-00509 (WHW), 2013 WL 3087078 (D.N.J. June 14, 2013)............................13

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
     551 U.S. 308 (2007)................................................3, 9, 20, 22, 23

Winer Family Trust v. Queen,
     503 F.3d 319 (3d Cir. 2007)..................................................... *passim*

**STATUTES AND RULES**                                                      **PAGE(S)**

15 U.S.C. § 78u-4(b)................................................................................9

15 U.S.C. § 78u-5(c)..............................................................11, 13, 15, 16

15 U.S.C. § 78u-5(d)..............................................................................16

15 U.S.C. § 78u-5(i)..............................................................................12

Fed. R. Civ. P. 9(b)............................................................................9, 22

**<u>STATUTES AND RULES</u>**                                         **<u>PAGE(S)</u>**

Fed. R. Civ. P. 12(b)(6).........................................................................................................3

# PRELIMINARY STATEMENT

Plaintiff's Amended Complaint (D.I. 18) against Defendants -- all former directors or officers of Savient Pharmaceuticals ("Savient") -- does not come close to meeting the pleading standards to allege securities fraud. It does <u>not</u> allege any purported "inside sources" of information, does <u>not</u> allege any insider trading, and does <u>not</u> even allege that Defendants had a motive for their purportedly wrongful conduct. Instead, it merely strings together snippets of Savient's public filings and assumes that because Savient <u>subsequently</u> filed voluntary petitions under Chapter 11 of the Bankruptcy Code seeking authorization to pursue a court-supervised auction sale process, its <u>earlier</u> public filings <u>must have been</u> false. This is a classic attempt to plead "fraud by hindsight," which has been flatly rejected in the Third Circuit (and all other circuits). Defendants' purported actions were legal, appropriate, and supported by the important "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." <u>Beleson v. Schwartz</u>, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009).

Further, Plaintiff wrongfully assumes -- without alleging <u>any facts</u> -- that Savient must have run out of cash because it filed for bankruptcy. (D.I. 18 ¶ 12.) That is simply not the case. Savient could have continued to fund its unprofitable operations for many more months, but instead, the Board determined that it was in Savient's best interest to file for bankruptcy for legitimate strategic reasons. No reasonable investor could infer from a bankruptcy filing alone that a company had no cash or that its prior cash projections were false when made.

Under the rigorous pleading requirements imposed by Congress in the Private Securities Litigation Reform Act of 1995 ("PSLRA") and by the Third Circuit, Plaintiff fails to allege sufficient facts to support a claim that "defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which

plaintiffs reasonably relied and plaintiff[s'] reliance was the proximate cause of their injury."

Rahman v. Kid Brands, Inc., 736 F.3d 237, 242 (3d Cir. 2013) (affirming dismissal of § 10(b)

claim).  Specifically, the Amended Complaint should be dismissed for the following reasons:

First, Plaintiff fails to adequately allege any actionable material misrepresentation

or omission.  (Section II infra.)  Plaintiff suggests that certain of Savient's earlier cash projections

were false and misleading because they were purportedly proven wrong by the Company's later

internal projection.  Yet, Plaintiff fails to allege any facts showing that Savient's earlier cash

projections were not made in good faith -- much less, knowingly false when made -- nor has he

alleged sufficient facts showing that Savient's earlier projections were actually inconsistent with

its later one.  Additionally, Savient's challenged projections are clearly "forward-looking" and

protected by the PSLRA's safe harbor.  Plaintiff further alleges that Savient's SEC filings

contained references to its Board's evaluation of potential "strategic alternatives," and he faults

Defendants for not contemporaneously disclosing details concerning those evaluations.  As a

matter of law, however, Defendants had no duty to affirmatively disclose such information and

provide the market with a "play-by-play" of such sensitive analyses.

Second, Plaintiff fails to plead facts that give rise to the requisite "strong

inference" that each Defendant acted with scienter.  (Section III infra.)  For example, Plaintiff's

so-called "Scienter Allegations" (D.I. 18 ¶¶ 63-65) amount to nothing more than impermissible

"group pleading" aimed -- wholly generically -- at all eleven "Defendants" in identical form.

Further, the Amended Complaint's pro forma list of each Defendant's name, position at Savient,

and the SEC filing he or she signed (id. ¶¶ 20-30) is grossly insufficient to support "a powerful

or cogent inference that is at least as compelling as any opposing inference."  Winer Family

Trust v. Queen, 503 F.3d 319, 327 (3d Cir. 2007).

*Third*, Plaintiff's § 20(a) claim against Defendants is derivative of his § 10(b) claim, and must be dismissed for the same reasons. Rahman, 736 F.3d at 247.

## SUMMARY OF FACTUAL ALLEGATIONS[1]

### A.   Savient And The Parties

Non-party Savient was a specialty biopharmaceutical company that focused on commercializing KRYSTEXXA, a drug used for certain types of chronic gout. (D.I. 18 ¶ 2.)

Matz Johansson, the sole plaintiff in this uncertified proposed class action, allegedly bought and/or sold Savient common stock ninety-one times between April 1, 2013 and October 14, 2013, often buying and selling on the same day. (Id. ¶ 18; Cert. Of Pl. Pursuant To The Fed. Sec. Laws ¶ 4, attached to D.I. 1.)

The Amended Complaint's allegations regarding each Defendant are skeletal, at best. Ferrari, Savient's President, Chief Executive Officer and Director until June 20, 2013, allegedly signed Savient's Form 10-K filed April 1, 2013 and Form 10-Q filed May 15, 2013. (D.I. 18 ¶ 20.) Crowley (Co-President and Chief Operating Officer), Hamill (Co-President and Chief Financial Officer), and Yachmetz (Co-President and Chief Business Officer) allegedly signed Savient's Form 10-Q filed August 14, 2013. (Id. ¶¶ 27-29.) Constantine, Jaeger, Meeker, Norton, Savage, and Thompson served as Directors of Savient and allegedly signed Savient's Form 10-K filed April 1, 2013. (Id. ¶¶ 21-26.) Newly-added defendant Gionco (Vice President of Finance and Chief Accounting Officer) allegedly signed Savient's Form 10-Qs filed May 15,

---

[1]     On a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also Winer, 503 F.3d at 328 (court may "probe[] documents attached to defendants' motion to dismiss" because they "were integral to and/or were explicitly relied upon by" the complaint). This summary cites certain public documents incorporated into the Amended Complaint and collected in the Transmittal Declaration of Robert S. Saunders ("Decl. __").

2013 and August 14, 2013.  (Id. ¶ 30.)  The Amended Complaint alleges no other particularized

facts with respect to these individuals.

### B.    April 1, 2013:  Savient Disclosed Substantial Risks In Its Form 10-K

In the "RISK FACTORS" section of its April 1, 2013 Form 10-K, Savient

disclosed numerous "[r]isks relating to the commercialization and further development of

KRYSTEXXA and our ability to accomplish our future business objectives."  (Decl. 3, at 25-50.)

One of those risks disclosed Savient's declining cash position and large accumulated deficit, the

fact that Savient had "no committed external sources of capital," and that Savient "may be

required to curtail or cease operations" if additional funds did not become available.  (Id. at 34-

35.)  Plaintiff claims that the underlined portions of the disclosure below were false:

> ***We will need to raise additional capital to execute upon our commercial
> strategy for KRYSTEXXA.  Such financing may only be available on
> terms unacceptable to us, or not at all.  If we are unable to obtain
> financing on favorable terms, our business, results of operations and
> financial condition may be materially adversely affected.***
>
> At December 31, 2012, we had $96.3 million in cash, cash equivalents and
> short-term investments, as compared to $169.8 million at December 31,
> 2011.  At December 31, 2012, we had an accumulated deficit of $535.9
> million.
>
> The development and commercialization of pharmaceutical products
> requires substantial funds and we currently have no committed external
> sources of capital . . . .
>
> Although our Board of Directors may from time-to-time evaluate strategic
> alternatives available to us to maximize value, we are proceeding with our
> commercialization of KRYSTEXXA in the United States . . . . Our future
> capital requirements will depend on many factors . . . .
>
> Based on our current commercialization plans for KRYSTEXXA,
> including, among other things, our anticipated expenses . . . , and
> assuming that we are able to generate KRYSTEXXA revenues at the level
> that we are currently expecting, we believe that our existing cash, cash
> equivalents and short-term investments will be sufficient to fund our
> anticipated operations into the second quarter of 2014.

> We expect that the cash needed to successfully commercialize
> KRYSTEXXA . . . and seek regulatory approvals . . . will be substantial,
> and we may need to seek additional funding . . . . There are substantial
> limitations in the indenture governing the 2019 Notes on our ability to
> issue additional debt securities. If additional funds are not available on
> favorable terms, or at all, our business, results of operations and
> financial condition may be materially adversely affected, and we may be
> required to curtail or cease operations.

(Id. (underlining added); see D.I. 18 ¶¶ 38, 47.) Plaintiff alleges that those underlined portions were false because (i) "the Company had retained Lazard to, among other things, explore a sale of the Company in March 2013," and (ii) "under the Company's updated long term plan for a stand-alone restructuring of Savient, completed in September 2013" -- nearly six months after Savient filed its Form 10-K -- "the Company could exhaust its cash in the first quarter of 2014 and ultimately need to equitize its debt." (D.I. 18 ¶¶ 38-40, 47, 50-51.)

### C.   May 15, 2013:  Savient Disclosed Substantial Risks In Its Form 10-Q

In the "RISK FACTORS" section of its May 15, 2013 Form 10-Q, Savient similarly disclosed numerous risks, including a further declining cash position and increasingly large accumulated deficit. (Decl. 5, at 27, 36-37.) Savient again disclosed that it still had "no committed external sources of capital," and "may be required to curtail or cease operations." (Id. at 36-37.) Plaintiff claims that the underlined portions of the disclosure below were false:

> ***We will need to raise additional capital to execute upon our commercial
> strategy for KRYSTEXXA. Such financing may only be available on
> terms unacceptable to us, or not at all.  If we are unable to obtain
> financing on favorable terms, our business, results of operations and
> financial condition may be materially adversely affected.***
>
> At March 31, 2013, we had $68.8 million in cash, cash equivalents and
> short-term investments, as compared to $96.3 million at December 31,
> 2012.  At March 31, 2013, we had an accumulated deficit of $560.4
> million.
>
> The development and commercialization of pharmaceutical products
> requires substantial funds and we currently have no committed external
> sources of capital . . . .

Although our Board of Directors may from time-to-time evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercialization of KRYSTEXXA in the United States . . . . Our future capital requirements will depend on many factors . . . .

Based on our current commercialization plans for KRYSTEXXA, including, among other things, our anticipated expenses . . . , our current strategy with respect to post authorization commitments in the EU, and assuming that we are able to generate KRYSTEXXA revenues at the level that we are currently expecting, taking into account our current internal pricing strategy, we believe that our existing cash, cash equivalents and short-term investments will be sufficient to fund our anticipated operations for at least the next twelve months . . . .

We expect that the cash needed to successfully commercialize KRYSTEXXA . . . and to seek regulatory approvals . . . will be substantial, and we may need to seek additional funding . . . . There are substantial limitations in the indenture governing the 2019 Notes on our ability to issue additional debt securities. If additional funds are not available on favorable terms, or at all, our business, results of operations and financial condition may be materially adversely affected, and we may be required to curtail or cease operations.

(Id. at 27, 36-37 (underlining added); see D.I. 18 ¶¶ 41, 48.) Plaintiff alleges that those underlined portions were false for the same reasons listed in supra Section B, and for the additional reason that "in May 2013, Lazard developed a list of potentially interested parties and solicited such parties' interest in a sales transaction." (D.I. 18 ¶¶ 41-43, 48, 50-51.)

### D. August 14, 2013:  Savient Disclosed Substantial Risks In Its Form 10-Q

In the "RISK FACTORS" section of its August 14, 2013 Form 10-Q, Savient disclosed numerous risks, including Savient's even further declining cash position and increasingly large accumulated deficit, the fact that Savient had nearly $300 million of indebtedness maturing in 2018-2019, that Savient still had "no committed external sources of capital," and that Savient "may be required to curtail or cease operations." (Decl. 6, at 27, 36-37.) Plaintiff claims that the underlined portions of the disclosure below were false:

> *We will need to raise additional capital to execute upon our commercial strategy for KRYSTEXXA and to repay our indebtedness.  Such financing may only be available on terms unacceptable to us, or not at*

***all. If we are unable to obtain financing on favorable terms, our
business, results of operations and financial condition may be materially
adversely affected.***

At June 30, 2013, we had $51.5 million in cash, cash equivalents and short-
term investments, as compared to $96.3 million at December 31, 2012. At
June 30, 2013, we had an accumulated deficit of $585.8 million. At June 30,
2013, we had $293.4 million of indebtedness maturing during 2018-2019.

The development and commercialization of pharmaceutical products
requires substantial funds and we currently have no committed external
sources of capital . . . .

Although our Board of Directors may <u>from time-to-time</u> evaluate strategic
alternatives available to us to maximize value, we are proceeding with our
commercialization of KRYSTEXXA in the United States . . . . Our future
capital requirements will depend on many factors . . . .

Based on our current commercialization plans for KRYSTEXXA, including,
among other things, our anticipated expenses . . . , our current strategy with
respect to adjustments to the timelines for initiation and completion of post
authorization commitments in the EU, and assuming that we are able to
generate KRYSTEXXA revenues at the level that we are currently
expecting after taking into account our current strategy to evaluate and
pursue aggressive price increases when appropriate, <u>we believe that our
available cash, cash equivalents and short-term investments will be
sufficient to fund our anticipated level of operations for at least the next
twelve months from the date hereof</u> . . . .

We expect that the cash needed to repay our indebtedness, successfully
commercialize KRYSTEXXA . . . and to seek regulatory approvals . . . will
be substantial, and we may need to seek additional funding . . . . There are
substantial limitations in the indenture governing the 2019 Notes on our
ability to issue additional debt securities. If additional funds are not
available on favorable terms, or at all, our business, results of operations
and financial condition may be materially adversely affected, and we may
be required to curtail or cease operations.

(<u>Id.</u> (underlining added); <u>see</u> D.I. 18 ¶¶ 44, 49.) Plaintiff alleges that those underlined portions

were false for the same reasons listed in <u>supra</u> Sections B and C and because "beginning in June

2013, Lazard contacted fifty-seven potential buyers, approximately seventeen of whom entered

into non-disclosure agreements with the Company. Upon completion of due diligence, five of

these parties submitted non-binding preliminary proposals and two parties, including [US WorldMeds], submitted definitive proposals."  (D.I. 18 ¶¶ 44-46, 49-51.)

### E.    October-December 2013:  Savient Announced Bankruptcy And Sale Process

Plaintiff alleges that on October 14, 2013, Savient announced that it had elected to file voluntary petitions under Chapter 11 of the Bankruptcy Code and had filed a motion to seek authorization to pursue a court-supervised auction sale process under the Bankruptcy Code "'designed to achieve the highest or best offer for the Company's assets.'"  (Id. ¶¶ 12, 52.)

Plaintiff alleges that a bankruptcy declaration submitted by Mr. Hamill stated "that Savient's Board had retained Lazard to, among other things, explore a sale of the Company in March 2013," and described some of Lazard's work.  (Id. ¶¶ 53-54.)  Plaintiff further alleges that the declaration "disclosed for the first time that the Company's updated long term plan for a stand-alone restructuring of Savient, completed in September 2013, could result in the Company exhausting its cash in the first quarter of 2014."  (Id. ¶ 55.)

In December 2013, Savient announced that it had reached an agreement with Crealta Pharmaceuticals LLC to acquire substantially all of its assets for approximately $120.4 million and that it had received court approval for the sale.  (Id. ¶ 58.)

### ARGUMENT

Plaintiff's § 10(b) claim should be dismissed for failure to state a claim.[2]

### I.    PLAINTIFF'S SECTION 10(B) CLAIM IS SUBJECT TO HEIGHTENED PLEADINGS STANDARDS

"To state a Rule 10(b) claim, plaintiffs must allege defendants made a

---

[2]    Because Plaintiff's § 20(a) claim is predicated on and derivative of his § 10(b) claim (D.I. 18 ¶ 81), the court also must dismiss the § 20(a) claim as a matter of law.  Rahman, 736 F.3d at 247 ("'Inasmuch as there cannot be Section 10(b) liability here, the individual defendants cannot be liable under Section 20(b).'").

misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff[s'] reliance was the proximate cause of their injury."  Rahman, 736 F.3d at 242 (quotation marks omitted) (affirming dismissal of § 10(b) claim for failure to plead scienter with sufficient particularity).  Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

    To further strengthen these high pleadings standards, Congress adopted the PSLRA as a check on "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation . . ." and to "curb frivolous, lawyer-driven litigation while preserving investors' ability to recover on meritorious claims."  Tellabs, 551 U.S. at 320, 322. "Under the PSLRA's heightened pleading standard, a private securities complaint involving an allegedly false or misleading statement must:  (1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, 15 U.S.C. § 78u-4(b)(1), and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, § 78u-4(b)(2)," i.e., "a mental state embracing intent to deceive, manipulate, or defraud."  Rahman, 736 F.3d at 242 (quotation marks omitted).  Plaintiff has not met those exacting requirements.

## II.    PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE MATERIAL MISREPRESENTATION OR OMISSION

### A.    Savient's Cash Projections Were Not False Or Misleading

    Plaintiff's allegations regarding the forward-looking cash projection contained in Savient's "updated long term plan for a stand-alone restructuring of Savient, completed in September 2013" (D.I. 18 ¶ 50), does not render Savient's earlier cash projections dated April, May, or August 2013 false or misleading for the following reasons:

First, this is a classic and impermissible attempt by Plaintiff to plead "fraud by hindsight."  The updated long-term plan was dated weeks -- or in some cases months -- after Savient's disclosures, and therefore, the cash projection contained in that later plan cannot render the earlier statements false when made.  The Third Circuit has flatly rejected such tactics:  "[t]o be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."[3]

Second, Plaintiff does not (and cannot) even allege that the cash projection in the September 2013 updated long-term plan was based on the same assumptions and conditions as the earlier projections; therefore, he has not sufficiently alleged falsity.  Indeed, each of the earlier cash projections was expressly conditioned on numerous circumstances.  (Decl. 3, at 35; Decl. 5, at 37; Decl. 6, at 37.)  For example, Savient's August 14, 2013 Form 10-Q stated that its forward-looking cash "estimate" was based on a number of assumptions regarding its "current" business strategies at the time the statements were made and on its future estimates of expenses and revenues:

> Based on our current commercialization plans for KRYSTEXXA, including, among other things, our anticipated expenses relating to sales and marketing activities, the cost of purchasing additional inventory, the cost of clinical development activities and our post marketing commitments for KRYSTEXXA in the United States, our current strategy with respect to adjustments to the timelines for initiation and completion of post authorization commitments in the EU, and assuming that we are able to generate KRYSTEXXA revenues at the level that we are currently expecting after taking into account our current strategy to evaluate and pursue aggressive price increases when appropriate, we believe that our available cash, cash equivalents and short-term investments, will be sufficient to fund anticipated level of operations for at least the next twelve months from the date hereof.  This estimate also reflects the

---

[3]     In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) (emphasis added); see also Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 158 (3d Cir. 2004) ("We have long rejected attempts to plead fraud by hindsight."); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999) (fraud cannot be inferred on the basis that "'[a]t one time the firm bathes itself in a favorable light,' but 'later the firm discloses that things are less than rosy'").

ongoing effects of our July 2012 and May 2013 reorganization plans, which <u>we expect will</u> generate significant operating expense savings going forward.

(Decl. 6, at 37 (emphasis added).)

The internal September 2013 cash projection was based on a number of <u>new and different</u> assumptions, including a "potential unprecedented new strategy" for KRYSTEXXA. (D.I. 18, Ex. A ¶ 30.) Consistent with that new potential strategy, the updated long term plan assumed, among other things, that Savient would undertake a "stand-alone restructuring" and would experience "unprecedented changes to [its] existing practices." (<u>Id.</u>) It was based on those assumptions, as well as <u>future</u> projections regarding estimated expenses and revenues, that management made its internal September 2013 cash projection. (<u>Id.</u> ("This long term plan indicated that, with the changes to their current practices contemplated by the new strategy, [Savient was] projected to experience a significant short-term revenue drop (before projected long term revenue increases) which could result in [Savient] nearly exhausting [its] cash in the first quarter of 2014 and requiring additional financing.").) By comparing the earlier projections to the September 2013 cash projection, Plaintiff does nothing more than compare apples to oranges. A later projection, made at a different time with different assumptions does not make an earlier one false.[4]

## B. <u>Savient's Cash Projections Fall Within The PSLRA's Safe Harbor</u>

Alleged misrepresentations are not actionable under the PSLRA if they fall within the safe harbor for forward-looking statements, 15 U.S.C. § 78u-5(c), which "applies to statements that are forward-looking as defined by the statute provided that they are (1) identified

---

[4]     Plaintiff's allegation that "by September 2013, Defendants knew, or recklessly disregarded, that the Company would exhaust its cash almost six months earlier" (D.I. 18 ¶ 51) mischaracterizes the September 2013 cash projection. As described in the bankruptcy declaration of Mr. Hamill, the updated long term plan indicated that Savient "could" -- as opposed to would -- exhaust its cash in the first quarter of 2014 under the new potential strategy. (<u>Id.</u>, Ex. A ¶ 30.)

as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 278-79 (3d Cir. 2010) (emphasis added). As discussed below, Savient's April, May, and August cash projections are not actionable because they were forward-looking statements accompanied by meaningful cautionary statements. In addition, Savient's cash projections were immaterial and were not made with actual knowledge of their alleged falsity.

## 1. Savient's Cash Projections Were Forward-Looking

The PSLRA's "broad statutory definition of 'forward-looking statement' . . . includes, *inter alia*, projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance."[5] Id. at 279. Here, Savient's cash projections were self-evidently forward-looking statements. They each projected future financial performance: "we believe that our existing cash, cash equivalents and short-term investments will be sufficient to fund anticipated operations . . . ." (Decl. 3, at 35 & Decl. 5, at 37 (emphases added); see also Decl. 6, at 37; Decl. 3, at 1 ("statements regarding our . . . future operations, future financial position, future results of operations, future cash flows, . . . future performance, projected costs and expenses . . . are forward-looking statements"); Decl. 5, at 18; Decl. 6, at 18.) Moreover, each cash projection was expressly predicated on assumptions about future financial, future economic, and future operational performance, including, for example, "anticipated expenses," "the cost of purchasing

---

[5]     The PSLRA defines a "forward-looking statement," in relevant part, as "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." 15 U.S.C. § 78u-5(i)(1).

additional inventory," "the cost of clinical development activities and our post marketing commitments," and "that we are able to generate KRYSTEXXA revenues at the level that we are currently expecting." (Decl. 5, at 37 & Decl. 6, at 37; <u>see also</u> Decl. 3, at 35.) Courts routinely dismiss § 10(b) claims based on such financial projections.[6]

### 2. Savient's Cash Projections Were Accompanied By Meaningful Cautionary Statements

Forward-looking statements are within the safe harbor if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "Cautionary language must be extensive, specific, and directly related to the alleged misrepresentation." <u>In re Aetna</u>, 617 F.3d at 282. The cautionary language in Savient's April, May, and August 2013 filings was extensive, specific, and directly related to Savient's cash projections and the assumptions underlying those projections. (<u>See</u> Decl. 3, at 1, 25-50; Decl. 5, at 18, 27-52; Decl. 6, at 18, 27-52.) For example, Savient warned among other things:

- "Commercializing KRYSTEXXA in the United States is complex and requires substantial capital resources. If our U.S. commercialization strategy is unsuccessful, market acceptance of KRYSTEXXA may be harmed, and <u>we will not achieve the revenues that we anticipate and may need additional funding</u>." (Decl. 3, at 25; Decl. 5, at 27; Decl. 6, at 27.)

- "Our business and ability to repay our obligations may be harmed if we have inaccurately predicted the market size for KRYSTEXXA, if we fail

---

[6]     See, e.g., <u>In re Aetna</u>, 617 F.3d at 281 ("Statements about future profitability and assumptions underlying management's expectations about the future fall squarely within the definition of forward-looking statement.") (affirming dismissal of § 10(b) claim); <u>In re Advanta</u>, 180 F.3d at 536 (statement that "'[o]ver the next six months [we] will experience a large increase in revenues'" protected by safe harbor); <u>Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.</u>, No. 12–cv–00509 (WHW), 2013 WL 3087078, at *16 (D.N.J. June 14, 2013) (statement that "[w]e believe that the cash flows from operations . . . will be sufficient to meet our liquidity needs for the next twelve months and for the long term" protected by safe harbor); <u>Building Trades United Pension Trust Fund v. Kenexa Corp.</u>, No. 09-2642, 2010 WL 3749459, at *3-4, 13-15 (E.D. Pa. Sept. 27, 2010) (similar); <u>In re Party City Sec. Litig.</u>, 147 F. Supp. 2d 282, 309-10 (D.N.J. 2001) (similar).

to appropriately penetrate the market or if we do not price KRYSTEXXA at an appropriate level . . . . [O]ur revenues may be harmed if we do not appropriately price KRYSTEXXA in that revenues will be lower if the list price for KRYSTEXXA is too low and sales may be harmed if it is too high."  (Decl. 3, at 27-28; see also Decl. 5, at 29; Decl. 6, at 29.)

- "If KRYSTEXXA does not achieve an adequate level of market acceptance, we may not generate sufficient revenues to achieve or maintain profitability."  (Decl. 3, at 28; Decl. 5, at 30; Decl. 6, at 30.)

- "We will need to raise additional capital to execute upon our commercial strategy for KRYSTEXXA.  Such financing may only be available on terms unacceptable to us, or not at all.  If we are unable to obtain financing on favorable terms, our business, results of operations and financial condition may be materially adversely affected . . . . There are substantial limitations in the indenture governing the 2019 Notes on our ability to issue additional debt securities.  If additional funds are not available on favorable terms, or at all, our business, results of operations and financial condition may be materially adversely affected, and we may be required to curtail or cease operations."  (Decl. 3, at 34-35; Decl. 5, at 36-37; see also Decl. 6, at 36-37.)

- "We have incurred operating losses since 2004 and we have incurred and anticipate that we will continue to incur substantial expenses in connection with our commercial launch of KRYSTEXXA in the United Sates and further development and efforts to obtain regulatory approval for KRYSTEXXA outside of the United States.  If we do not generate significant revenues from the sale of KRYSTEXXA, we will not be able to achieve profitability."  (Decl. 3, at 47; Decl. 5, at 49; Decl. 6, at 49.)

- "We have substantial indebtedness that may adversely affect our cash flow and otherwise negatively affect our operations."  (Decl. 3, at 47; Decl. 5, at 49; Decl. 6, at 49.)

(Emphases added.)  Because Savient provided multiple and clear warnings to investors that the accuracy of its cash projections could not be assured, and that its actual financial performance, plans and objectives may differ materially from those assumed for purposes of calculating its projections, they are not actionable under the PSLRA.  See In re Aetna, 617 F.3d at 282-83.

**3.      Savient's Cash Projections Did Not Significantly Alter
The Total Mix Of Information And Thus Were Immaterial**

The PSLRA's safe harbor also applies to forward-looking statements that are not material.  15 U.S.C. § 78u-5(c)(1)(A)(ii).  A statement or omission "is material if there is a

14

substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." In re Aetna, 617 F.3d at 283. "A material misrepresentation or omission is actionable if it significantly altered the 'total mix' of information made available." Id. (quotation marks omitted). As the Third Circuit recognized, ". . . complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." Id.

   Here, Savient's statements regarding its future cash projections -- which were contained in the "RISK FACTORS" sections of its Form 10-K and 10-Q filings -- were accompanied with far too many qualifications and assumptions to amount to anything on which a reasonable investor might rely, much less mount a securities fraud class action. See supra Section II.B.1-2. At a minimum, Savient's filings conveyed the enormous difficulties involved with commercializing KRYSTEXXA, the bleakness of Savient's financial state, and Savient's continuing and critical need for capital. (See Decl. 3, at 25-50; Decl. 5, at 27-52; Decl. 6, at 27-52.) As Savient first disclosed on April 11, 2013, its common stock was even at serious risk of being delisted by NASDAQ because it had been trading under $1 per share for months.[7] Indeed, even if an investor read nothing more than the subsection of Savient's Form 10-K and 10-Qs containing the cash projections, he would see that the Company had been steadily drawing down its cash from December 31, 2011 ($169.8 million) to June 30, 2013 ($51.5 million) and still had "no committed external sources of capital." (Decl. 3, at 34; Decl. 5, at 36; Decl. 6, at 36.) He also would see that Savient had an accumulating deficit of over $550 million and nearly $300 million of indebtedness maturing in 2018-19. (Decl. 3, at 34; Decl. 5, at 36; Decl. 6, at 36.) As

---

[7]  The Amended Complaint incorrectly suggests that the specter of delisting only arose after Savient's bankruptcy filing. (D.I. 18 ¶ 57.) However, Savient had publicly disclosed months earlier, on April 11, 2013 and August 14, 2013, that it had received a letter from NASDAQ on April 8, 2013, warning that if it did not bring its share price up to a minimum bid of $1 by October 7, 2013, it would be subject to delisting. (Decl. 4, at 2; Decl. 6, at 51.)

Savient stated in its filings, "[i]f additional funds are not available on favorable terms, or at all, our business, results of operations and financial condition may be materially adversely affected, and we may be required to curtail or cease operations." (Decl. 3, at 35; Decl. 5, at 37; Decl. 6, at 37.) When read in context, no reasonable investor could infer that because Savient had projected, under certain assumptions, that its cash could last twelve more months, that Savient would necessarily operate for the twelve months. Thus, Savient's future cash projections did not alter the total mix of information available and are not actionable. See In re Aetna, 617 F.3d at 284.

      **4.**     **Savient's Cash Projections Were Not Made<br>With Actual Knowledge Of Their Alleged Falsity**

Alternatively, the PSLRA's safe harbor also applies to forward-looking statements made without actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B); In re Aetna, 617 F.3d at 285. As discussed in infra Section III, Plaintiff fails to sufficiently plead actual knowledge; thus, Savient's statements fall within the safe harbor.

    **C.**     **Under The PSLRA There Was No Duty To<br>Update Savient's Forward-Looking Cash Projections**

Plaintiff's attempt to base his fraud claim on Defendants' alleged failure to update Savient's April, May, or August 2013 forward-looking cash projections following the "completion of the Company's long-term plan for the restructuring of Savient by September 2013" is insufficient as a matter of law. (D.I. 18 ¶ 51.) The PSLRA clearly forecloses Plaintiff's claim that Defendants had a duty to update those forward-looking statements. See 15 U.S.C. § 78u-5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement."). Courts in the Third Circuit and elsewhere are in accord.[8] Thus,

---

[8]    See, e.g., In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1433 (3d Cir. 1997) ("voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update" because "disclosure of a specific earnings forecast does not contain the implication that the forecast will continue to hold good even as circumstances change"); In re Advanta, 180 F.3d at

*(cont'd)*

Defendants' alleged failure to update Savient's earlier cash projections is not actionable.

### D. There Was No Duty To Affirmatively Disclose Details About The Board's Evaluation Of Potential Strategic Alternatives

To the extent that Plaintiff attempts to base his fraud claim on Savient's nondisclosure of information concerning the Board's specific evaluation of potential strategic alternatives, Plaintiff has failed to plead facts sufficient to support such a claim as a matter of law. The Third Circuit has held that "[t]he securities laws do not require a defendant 'provide the public with all material information.'" Winer, 503 F.3d at 329. An affirmative duty to disclose "arises only when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." Id. "[S]tatements that are simply incomplete," however, do not trigger a duty to disclose under § 10(b). Id. at 330 (citing Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) ("Rule 10b-5 . . . prohibit[s] only misleading and untrue statements, not statements that are incomplete . . . . Often, a statement will not mislead even if it is incomplete or does not include all relevant facts.") (emphasis in original) and Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc) ("[The duty to disclose rule] does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so 'incomplete as to mislead.'")).

Even assuming that information regarding the Board's engagement of Lazard was material, which it was not, Defendants had no duty to disclose that information because (i) the Amended Complaint does not (and cannot) allege insider trading, (ii) no statute required such

---

(cont'd from previous page)

536 (corporation "owed no duty to update" forward-looking projection of revenues and statement of plan despite a change in business strategy); Bonomo v. Nova Fin. Holdings Inc., Civ. A. No. 11-4762, 2012 WL 2196305, at *5 (E.D. Pa. June 15, 2012) ("[T]he law does not impose a duty to update forward-looking statements such as earnings estimates with all relevant material information and/or upon changes in business strategy.").

disclosure, and (iii) Defendants made no false or misleading statements -- Savient disclosed that

its "Directors may from time-to-time evaluate strategic alternatives available to us to maximize

value," and that is allegedly what the Board actually did. (See D.I. 18 ¶¶ 6, 8.) Savient never

limited, nor, indeed, provided, any affirmative statement or factual representation about the range

of strategic alternatives that may have been under consideration or about which options looked

most viable at any moment in time.[9] At most, Plaintiff has merely alleged facts suggesting that

Savient's statements were "simply incomplete" in that they did not describe Lazard's work for the

Board or the substance of the Board's evaluations. Winer, 503 F.3d at 330. That is insufficient

as a matter of law to state a securities fraud claim.[10] See id.

---

[9]     The Third Circuit has held in analogous cases that there is no duty to disclose additional
information or update a prior disclosure absent an affirmative statement or factual representation
addressing the specific subject matter. See, e.g., City of Edinburgh Council v. Pfizer Inc., No.
13-2314, 2014 WL 2535383, at *11-12 (3d Cir. June 6, 2014) (affirming dismissal of § 10(b) and
§ 20(a) claims, reasoning that company had no duty to disclose additional information about
Phase 2 interim results referenced in a public disclosure because company had "made no
affirmative statement about the strength of the Phase 2 interim results nor characterized those
results in any manner"); Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000) (affirming
dismissal of § 10(b) claim, reasoning that company had no duty to update disclosures of data
indicating potential link between its drugs and heart-valve disorders with information on when it
became aware of that data because those disclosures "were simply silent on the subject").

[10]     Plaintiff's attempt to allege that an innocuous change in language between Savient's
August 8, 2011 Form 10-Q and its November 8, 2011 Form 10-Q disclosed a "fundamental
change in direction" and triggered a continuing duty to update the market for years to come (D.I.
18 ¶¶ 6, 40, 43, 46) is flawed for several reasons. First, the change from "the Board of Directors
expects to continue to evaluate strategic alternatives" to "our Board of Directors may from time-
to-time evaluate strategic alternatives" (Decl. 1, at 49 & Decl. 2, at 51 (emphases added)) is a
change in form not substance. Second, the alleged fundamental change in direction -- that
Savient was proceeding with the commercialization of KRYSTEXXA (D.I. 18 ¶ 6) -- had been
disclosed in filings prior to the November 8, 2011 Form 10-Q. Third, the November 8, 2011
Form 10-Q did not foreclose the possibility that Savient would at some point change its plan, and
made no affirmative statement concerning Savient's possible strategic alternatives. Fourth, the
November 8, 2011 Form 10-Q did not suggest that the Board would not simultaneously evaluate
strategic alternatives and continue with the previously disclosed plan to commercialize
KRYSTEXXA.

Moreover, courts have held in analogous circumstances that the nondisclosure of bankruptcy planning does not by itself render a company's prior public statements misleading for purposes of § 10(b).  For example, in <u>Beleson v. Schwartz</u>, a satellite communications company facing "severe financial difficulties" and $2.2 billion in outstanding debt hired advisors to explore ways to improve its situation, including a sale of the company's satellites as part of a prepackaged bankruptcy.  599 F. Supp. 2d at 521.  Similar to Savient, the company made various disclosures during this period, including that the company was "'on plan' to have $65 million in cash at the end of the year," but it did not disclose its consideration of bankruptcy until it announced a signed asset purchase agreement and its Chapter 11 bankruptcy filing.  <u>Id.</u> at 522-23. Citing the company's Form 10-K -- which, like Savient, disclosed its losses, declining cash reserves, and the fact that it was at risk of losing its listing on the NYSE because its stock had traded below $1 -- the court concluded "that the company would end up filing a petition in bankruptcy was not a prospect outside the realm of possibilities that the securities markets would have anticipated, or that reasonable investors would have guarded against."  <u>Id.</u> at 525.  The court further explained that important policy considerations also supported its holding that the company had <u>no duty to disclose</u> its potential sale and bankruptcy:

> Such an outcome is further supported by the public policy justifications for allowing a company operating near insolvency to make careful deliberations about it future, free from any obligation to disclose potential bankruptcy. [] Any standard mandating disclosure of contingent bankruptcy planning would put an unacceptable burden on corporations and their officers.  Such a standard might amount to a self-fulfilling prophecy, ensuring that all companies that begin contingent preparations for bankruptcy would inevitably go bankrupt because, upon disclosure of the plans, investors would immediately lose confidence in the company and close the capital markets.

Id. at 527 (citation omitted), aff'd, 419 Fed. Appx. 38, 40 (2d Cir. 2011).  Those public policy

justifications apply here with equal force and support dismissal of the Amended Complaint.[11]

## III.   PLAINTIFF FAILS TO ALLEGE WITH PARTICULARITY FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

Plaintiff's § 10(b) claim also must be dismissed because he has not sufficiently

alleged facts that support a strong inference that each Defendant acted with scienter when

making the alleged misrepresentations.  "[A] plaintiff must state with particularity facts giving

rise to a *strong inference* that the defendant acted with the required state of mind."  Rahman, 736

F.3d at 242 (quotation marks omitted).[12]  "[A]n inference of scienter must be more than merely

plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent."  Id. (quoting Tellabs, 551 U.S. at 314); see also Winer, 503 F.3d at 327

("the facts must give rise to a 'strong,' i.e., a powerful or cogent inference that is at least as

compelling as any opposing inference").  Here, the Amended Complaint does not contain facts

that give rise to any inference of scienter, much less a strong inference, that any Defendant -- let

alone each Defendant -- knowingly or recklessly made false statements to mislead Plaintiff.

---

[11]    See also In re Tower Auto. Sec. Litig., 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (dismissing § 10(b) claim based on company's bankruptcy planning because "failure to disclose its bankruptcy planning did not make . . . other disclosures misleading"); L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc., 921 F. Supp. 1174, 1181 (S.D.N.Y. 1996) (dismissing § 10(b) claim based on company's undisclosed evaluation of a potential bankruptcy restructuring or sale because it would not have altered the "total mix" of publicly-available information).

[12]    "Scienter" is "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 148 (3d Cir. 2004).

## A. Plaintiff's Conclusory "Scienter Allegations" Amount To Impermissible Group Pleading And Should Be Rejected

The bulk of Plaintiff's so-called "Scienter Allegations" (D.I. 18 ¶¶ 63-65) are nothing more than lumped-together "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action," vaguely aimed at all eleven Defendants as a group. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007). For example, Plaintiff's assertion that "Defendants acted with scienter because they (i) knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws," (D.I. 18 ¶ 63 (emphasis added)) is insufficient to survive dismissal under ordinary pleading standards, much less the PSLRA. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557) ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'").

Indeed, "[t]he Third Circuit has explicitly rejected such 'group pleading' as incompatible with the PSLRA's requirement that plaintiffs 'specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'" Bartesch v. Cook, 941 F. Supp. 2d 501, 510 (D. Del. 2013) (quoting Winer, 503 F.3d at 337 ("We . . . hold the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA.")). Here, except for the Amended Complaint's reference to the bankruptcy declaration of Mr. Hamill and an October 14, 2013 press release quoting Mr. Jaeger's statement that "[t]he Board and management team have conducted a rigorous assessment of all of our strategic options," the Amended Complaint only identifies specific Defendants where it lists each Defendant's position at Savient and whether he or she signed Savient's Form 10-K or Form 10-Q.

(See D.I. 18 ¶¶ 20-30, 65.) Those paltry allegations are legally insufficient to plead a strong inference of scienter with particularity.[13]

Moreover, in an inappropriate attempt to rein even more people into his meritless lawsuit, Plaintiff has added a new Defendant to the Amended Complaint: David Gionco, Savient's former Vice President of Finance and Chief Accounting Officer. Yet, Plaintiff has not alleged that Mr. Gionco was on the Board, participated in or had any knowledge of the Board's evaluation of Savient's strategic alternatives, or had any knowledge of the alleged falsity of Savient's cash projections. The only allegation against him in the entire Amended Complaint is that he signed two Form 10-Qs. (D.I. 18 ¶ 30.) That is not enough under any pleading standard, much less the exacting standards of the PSLRA.

**B.      A Strong Inference Of Scienter Cannot
         Be Inferred From Savient's Cash Projections**

The only "fact" Plaintiff alleges in support of his assertion that Defendants intended to "deceive, manipulate or defraud" investors in connection with Savient's April, May, and August cash projections is that Defendants purportedly knew about the internal cash projection contained in the subsequent September 2013 updated long term plan. (See id. ¶¶ 63-65.) A reasonable person could not infer from that allegation that Defendants must have known

---

[13]      See, e.g., In re Advanta, 180 F.3d at 539 (holding that "allegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b)" (quotation marks omitted)); Bartesch, 941 F. Supp. 2d at 510-11 (dismissing § 10(b) claim for lack of scienter where "[f]or the most part, the only allegations in which specific defendants are even identified are those that state the defendants' positions at [the company] and who signed [the company's] class period SEC filings"); City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc., 686 F. Supp. 2d 404, 420 (D. Del. 2009) (dismissing § 10(b) claim because Sarbanes-Oxley certifications did not support scienter where plaintiffs failed to "plead with sufficient particularity that [defendants were] aware or should have been aware of" the alleged falsity of those certifications "at the time [they] were made"); see also Tellabs, 551 U.S. at 326 ("omissions and ambiguities count against inferring scienter"); In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 224 (3d Cir. 2002) (similar).

months earlier in April, May, and August 2013 that Savient's cash projections were purportedly false or misleading when made.  See Winer, 503 F.3d at 331-32 (holding that plaintiff cannot attempt to prove fraud by hindsight under § 10(b) and citing Tellabs, 551 U.S. at 320 ("The 'strong inference' formulation was appropriate, the Second Circuit said, to ward off allegations of 'fraud by hindsight.'")).  Plaintiff pleads no facts to suggest that each Defendant knew about the September 2013 cash projection prior to Savient's April, May, and August 2013 projections, nor does he plead facts showing that each Defendant adopted the September 2013 projection or believed the latter projection rendered the prior projections false.  See id. at 332 (holding that a reasonable person could not infer scienter where the plaintiff did not adequately allege that the speaker knew of contradictory information prior to the challenged statement or that the speaker adopted that contradictory information).  Plaintiff simply has not alleged facts to support "a powerful or cogent inference" of scienter as to each Defendant.

> Winer Family Trust v. Queen presented analogous facts and supports dismissal of the Amended Complaint.  503 F.3d at 324-28.  In that case, the investor claimed that the company had inflated its stock price through public statements that omitted or misstated facts about the company's renovations of a newly-purchased facility.  The investor alleged that:

- On February 20, 2002, the company announced that the new facility was "perfectly suited to our needs" and required "minimal improvements."

- Over the next several months, the company disclosed that the estimated cost would be $10.5 million to $15 million and then subsequently revised that estimate to between $11.5 million and $16 million.

Id. at 324.  The investor claimed that the company's statements "were knowingly false and misleading because they failed to disclose that the facility needed a major overhaul costing over $18 million."  Id. at 327.  The district court held that the investor "failed to allege facts giving rise to a strong inference that, as of February 20, 2002, [the company's president] knew that the

[facility] would require anything more than minimal improvements." <u>Id.</u> at 328. Rather, "the most plausible inference from these events" was that the company "realized that the cost of renovations would be more extensive than previously estimated." <u>Id.</u> The Third Circuit affirmed, holding that the investor's inference that the company's later estimates rendered the prior estimates false or misleading was "neither cogent, nor compelling, nor strong in light of competing inferences." <u>Id.</u> at 329. The same result applies here. Plaintiff has not alleged facts giving rise to a strong inference that, as of April, May, or August 2013, each Defendant knew that Savient's cash projections were inaccurate. The more plausible inference is that Savient later projected that, under different assumptions, its cash might not last as long as previously estimated.

C.     **A Strong Inference Of Scienter Cannot Be Inferred From Savient's Reference To Strategic Alternatives**

With respect to Savient's statements from April, May, and August 2013 that referred to the Board's evaluation of strategic alternatives from time-to-time, Plaintiff claims that Defendants knew Savient's statements were false and misleading because they allegedly were aware at the time that the Board had retained Lazard to explore, among other things, a potential sale of the company. (See D.I. 18 ¶¶ 63-65.) However, Savient's challenged statement -- that "[a]lthough our Board of Directors may from time-to-time evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercialization of KRYSTEXXA" (see, e.g., Decl. 5, at 37) -- purported only to provide investors with a statement of Savient's intentions at that time to proceed with its commercialization of KRYSTEXXA. The statement did not foreclose the possibility that the Savient might, at some later time, change its plans. Nor did the statement suggest that the Board would not simultaneously evaluate strategic alternatives. Quite the contrary, a reasonable investor would conclude from that statement that the Board may indeed be engaged in such evaluations, but that notwithstanding the Board's

activities, the Company intended at that time to proceed with its commercialization plan. (Nothing else makes sense: Savient could not simply do nothing, pending implementation of another alternative.) Accordingly, "[t]aking the facts pleaded as true and viewing them holistically, a reasonable person would not deem the inference of scienter as cogent and at least as compelling as any non-culpable inference based upon the omitted facts." Winer, 503 F.3d at 329-30 (holding that a reasonable person could not infer scienter from the company's nondisclosure of the third party that controlled the purchase and renovation of the company's new facility because "[t]he challenged statements -- [its] press releases and SEC filings -- purported only to provide an outline of [the company's] plans and objectives regarding future renovations").

## CONCLUSION

WHEREFORE, the Court should dismiss Plaintiff's Amended Class Action Complaint with prejudice.

<table>
<tr>
<td>

OF COUNSEL:

James R. Carroll
Alisha Q. Nanda
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Tel.: (617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com

</td>
<td>

Respectfully submitted,

 /s/ Robert S. Saunders
Robert S. Saunders (ID No. 3027)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 North King Street, 7th Floor
Wilmington, Delaware 19801
Tel.: (302) 651-3000
Fax: (302) 651-3001
rob.saunders@skadden.com

*Counsel for Defendants*
*Louis Ferrari, Ginger Constantine, M.D.,*
*Stephen O. Jaeger, David P. Meeker, M.D.,*
*David Y. Norton, Robert G. Savage, Virgil*
*Thompson, Richard Crowley, John P. Hamill,*
*Philip K. Yachmetz, and David G. Gionco*

</td>
</tr>
</table>

DATED: July 23, 2014