IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MATZ JOHANSSON, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> LOUIS FERRARI, GINGER CONSTANTINE, M.D., STEPHEN O. JAEGER, DAVID P. MEEKER, M.D., DAVID Y. NORTON, ROBERT G. SAVAGE, VIRGIL THOMPSON, RICHARD CROWLEY, JOHN P. HAMILL, PHILIP K. YACHMETZ, and DAVID G. GIONCO, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 14-42-GMS |

# MEMORANDUM

## I. INTRODUCTION

The plaintiff Matz Johansson ("Johansson") initiated this securities fraud action against former directors and officers (collectively, "the Defendants") of Savient Pharmaceuticals ("Savient") on January 15, 2014.[1] (D.I. 1.) Johansson alleges that the Defendants violated Rule 10b-5, promulgated under Section 10(b) of the Exchange Act. *See* 17 C.F.R. § 240.10b-5.[2] On June 30, 2014, Johansson filed an Amended Complaint. (D.I. 18.) Presently before the court is

---

[1] The Defendants are: Louis Ferrari ("Ferrari"); Ginger Constantine, M.D. ("Constantine"); Stephen O. Jaeger ("Jaeger"); David P. Meeker, M.D. ("Meeker"); David Y. Norton ("Norton"); Robert G. Savage ("Savage"); Virgil Thompson ("Thompson"); Richard Crowley ("Crowley"); John P. Hamill ("Hamill"); Philip K. Yachmetz ("Yachmetz"); and David G. Gionco ("Gionco"). Ferrari was Savient's President, CEO, and director from July 2012 until his resignation in June 20, 2013. Following Ferrari's resignation, Crowley (COO), Hamill (CFO), and Yachmetz (CBO) served as Savient's co-presidents. Gionco was Savient's Vice President of Finance and CAO. Constantine, Jaeger, Meeker, Norton, and Savage served as directors. (D.I. 18, ¶¶ 20–30.)

[2] Johansson also alleges that the Defendants violated Section 20(a) of the Exchange Act, but both parties agree that this claim rises and falls with the Rule 10b-5 claim.

the Defendants' Motion to Dismiss the Amended Complaint, filed on July 23, 2014. (D.I. 19.) For the reasons that follow, the court will grant the Defendants' motion to dismiss.

## II. BACKGROUND[3]

Savient, a non-party in the present action, was a specialty biopharmaceutical company that developed KRYSTEXXA, a drug used to treat certain types of chronic gout in adult patients. (D.I. 18, ¶ 2.) In a Form 10-Q filed with the SEC on November 8, 2010, Savient stated that its "initial strategic plan" had been to "seek a sale of [the] company following the approval of KRYSTEXXA by the FDA." (*Id.* ¶ 3.) Savient disclosed, however, that its strategy had, to that point, not proved fruitful. (*Id.*) As a result, Savient stated that it was "now focusing [its] efforts on implementing [its] plans to commercially launch KRYSTEXXA." (*Id.*) Nonetheless, Savient included the caveat that it "would continue to evaluate available strategic alternatives which would allow the maximization of value." (*Id.*) Savient made similar disclosures in a Form 10-K on March 1, 2011—"[A]lthough our Board of Directors expects to continue to evaluate strategic alternatives available to us to maximize value, our plan is to launch KRYSTEXXA ...." (*Id.* ¶ 4)—and a Form 10-Q on May 10, 2011—"[A]lthough our Board of Directors expects to continue to evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercial launch of KRYSTEXXA in the United States ...." (*Id.* ¶ 5.)

On November 8, 2011, Savient filed a Form 10-Q with slightly different language: "[A]lthough our Board of Directors may *from time-to-time* evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercial launch of KRYSTEXXA in the United States ...." (*Id.* ¶ 6 (emphasis added).) The "from time-to-time"

---

[3] The court limits its outline of the facts to those alleged in Johansson's Amended Complaint. (D.I. 18.) The Amended Complaint, however, incorporates by reference numerous SEC filings—which the Defendants have provided in their entirety—and a declaration from Hamill submitted to Bankruptcy Court ("Hamill Declaration). (D.I. 18, Ex. A; D.I. 21, 26.) It is proper for the court to consider the allegations in light of these other documents, even at the motion to dismiss stage. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 3201 (2007). Thus, during its discussion of the law, the court may supplement these facts with additional context from the SEC filings and the Hamill Declaration.

language was included in subsequent filings in February 2012, May 2012, August 2012, November 2012, April 2013, May 2013, and August 2013. (*Id.* ¶ 7.)

In March 2013, Savient's directors retained Lazard Frères & Co. LLC ("Lazard") to serve as a financial advisor and to explore a sale transaction. (*Id.* ¶ 8.) In May 2013, Lazard compiled a list of potential buyers. (*Id.*) Lazard subsequently contacted fifty-seven potential buyers: seventeen entered into non-disclosure agreements; five submitted non-binding proposals to acquire Savient; and two—including US WorldMeds, LLC ("US WorldMeds")—submitted definitive proposals. (*Id.*) Savient made no mention of Lazard or a possible sale in its April 2013 Form 10-K, its May 2013 Form 10-Q, or its August 2013 Form 10-Q. (*Id.*)

In those same filings, Savient also included statements concerning the sufficiency of its cash holdings. In the April 2013 Form 10-K: "[E]xisting cash, cash equivalents and short-term investments will be sufficient to fund our anticipated operations into the second quarter of 2014." (*Id.* ¶ 9.) Savient repeated this representation in its May 2013 Form 10-Q. (*Id.* ¶ 10.) In its August 2013 Form 10-Q, Savient went further, stating that its cash position "will be sufficient to fund anticipated levels of operations for *at least the next twelve months* from the date hereof," *i.e.*, until August 2014. (*Id.* (emphasis added).)

In September 2013, Savient "updated its long term plan for a stand-alone restructuring." (*Id.* ¶ 11.) As a consequence, Savient projected that it would experience a "significant short term revenue drop" and that it could exhaust its cash in the *first quarter of 2014*. (*Id.*) But on October 14, 2013, Savient announced that it would file voluntary petitions for Chapter 11 bankruptcy, in the United States Bankruptcy Court for the District of Delaware. (*Id.* ¶ 12.) Savient also sought authorization, pursuant to Section 363 of the U.S. Bankruptcy Code, to sell the company. (*Id.*) Sloan Holdings C.V. ("Sloan")—a subsidiary of US WorldMeds—had submitted a bid of approximately $55 million to acquire Savient. (*Id.*) Pending Bankruptcy Court approval,

3

Savient would auction itself to the highest bidder, with Sloan's bid serving as the minimum acceptable purchase price. (*Id.*) After the bankruptcy and corresponding sale announcement, Savient's share price dropped 88% from a close of $0.5737 per share on October 14, 2013, to a close of $0.0716 on October 15, 2013. (*Id.* ¶ 13.)

On December 16, 2013, Savient filed a Form 8-K disclosing that Crealta Pharmaceuticals LLC had submitted the highest bid at auction, acquiring all of Savient's assets for approximately $120.4 million. (*Id.* ¶ 58.) The Bankruptcy Court approved the sale. (*Id.*) All outstanding shares of Savient's common stock were subsequently cancelled. (*Id.* ¶ 60.)

Between April 1 and October 14, 2013, the asserted "class period," Johansson bought and/or sold Savient common stock ninety-one times. (D.I. 1.)

## III. STANDARD OF REVIEW

### A. <u>Federal Rules of Civil Procedure 8(a) & 12(b)(6)</u>

The Federal Rules of Civil Procedure require that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). A defendant may move to dismiss a complaint if the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While the complaint need not include "detailed factual allegations," it must at least contain "sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). To be facially plausible a claim must be supported by "well-pleaded facts that permit the court to infer more than a mere possibility of misconduct." *Id.* at 679.

The issue before the court when deciding a Rule 12(b)(6) motion "is not whether a plaintiff will ultimately prevail" but, rather, whether the plaintiff's complaint is plausible enough to entitle him to offer evidence in support of his claims. *In re Burlington Coat Factory Sec.*

4

*Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997). In evaluating a motion under Rule 12(b)(6), the court accepts all factual allegations in the complaint as true, so long as they are not simply "legal conclusions[s] couched as factual allegations[s]." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "[a] motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington*, 114 F.3d at 1420.

### B. Federal Rule of Civil Procedure 9(b)

Under Federal Rule of Civil Procedure 9(b), claims that allege fraud or mistake are subject to a heightened pleading standard; a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) serves to give defendants 'notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (alterations in original) (quoting *In re Burlington*, 114 F.3d at 1418). "Although [Rule 9(b)] falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (internal quotation marks omitted).

### C. Private Securities Litigation Reform Act

A plaintiff must allege the following elements to state a claim for a violation of Rule 10b-5: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). The Private

Securities Litigation Reform Act ("PSLRA") addressed the pleading standard for the first two of these elements. *Material misrepresentation/omission*: "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). *Scienter*: "[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. § 78u-4b(2)(a). The standards imposed by the PSLRA are in addition to the traditional federal pleading requirements, set by Federal Rules of Civil Procedure 8, 9, and 12, and federal case law.[4] *See, e.g., Iqbal*, 556 U.S. 662; *Twombly*, 550 U.S. 544.

## IV. DISCUSSION

Johansson contends that two categories of disclosures in the April, May, and August 2013 SEC filings ("class period filings") were violations of Rule 10b-5: (1) Savient's failure to update the public concerning the directors' evaluation of potential strategic alternatives, and (2) Savient's cash projections indicating that it could operate at least into the second quarter of 2012. The Defendants argue that Johansson's Amended Complaint does not state a claim for either category because Johansson failed to allege an actionable misrepresentation or omission and failed to allege sufficient facts to support a "strong inference" of scienter. The court examines each alleged fraud in turn.

---

[4] "To the extent that Rule 9(b) conflicts with the PSLRA, the statute supersedes it." *Key Equity Investors v. Sel-Leb Mktg.*, 246 F. App'x 780, 784 n.5 (3d Cir. 2007) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n.5 (3d Cir. 1999)).

A. <u>Strategic Alternatives</u>

Prior to November 2011, Savient stated in its SEC filings: "Although our Board of Directors expects to continue to evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercial launch of KRYSTEXXA in the United States...." (D.I. 18, ¶¶ 3–5; D.I. 21, Ex. 1 at 49.) In all filings from November 2011 on, including the class period filings, Savient made similar statements but with slightly different phraseology: "Although our Board of Directors may from time-to-time evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercialization of KRYSTEXXA in the United States...." (D.I. 18, ¶¶ 6, 7; D.I. 21, Ex. 2 at 51.) According to Johansson, this change signaled a "fundamental change in direction"—*i.e.*, that the company no longer actively seeking to sell. (D.I. 24 at 10–12.) Therefore, when the directors retained Lazard to solicit interest in a sale of Savient in March 2013, Johansson asserts that Savient had a duty to update their disclosures. The Defendants each signed at least one of the class period filings, which made no mention of Lazard or the directors' interest in shopping the company.

1. **Material Omission**

The Defendants argue that they never had a duty to update the class period filings and therefore Johansson's allegations fail to state an actionable omission. The court agrees.

"When an allegation of fraud under section 10(b) is based upon a nondisclosure, there can be no fraud absent a duty to speak." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315–16 (3d Cir. 1997) (quoting *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1418 (3d Cir. 1993). "The duty to update, in contrast to the duty to correct, concerns statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *In re Burlington*, 114 F.3d at 1431. "Where the initial disclosure relates to the announcement of a fundamental change in the course the company is likely to take," the Third Circuit has explained

7

that "there may be room to read in an implicit representation by the company that it will update the public with news of any radical change in the company's plans—*e.g.*, news that [a] merger is no longer likely to take place." *Id.* at 1433–34.

The court finds that the subtle change in language in the filings before and after November 2011—from "expects to continue to evaluate strategic alternatives" to "may from time-to-time evaluate strategic alternatives" (D.I. 18 ¶¶ 5, 6)—did not present a fundamental change in direction of Savient's business. As the Defendants frame it, the shift was "an innocuous change," *i.e.*, "a change in form not substance." (D.I. 20 at 18 n.10.) But even if the new phrasing signaled more than a semantic blip, at all relevant times Savient still maintained that its overall plan was to "proceed[] with [its] commercial launch of KRYSTEXXA." (D.I. 18, ¶¶ 4–7.) Perhaps "from time-to-time" indicated that the directors were not searching as proactively for a strategic alternative as they had been previously, but, regardless, Savient's plan to launch KRYSTEXXA remained the disclosed objective. Johansson's contention that "Savient made an affirmative statement regarding the strategic direction of the Company which indicated that it had shifted focus from strategic alternatives to the future development of KRYSTEXXA" is simply inaccurate in light of his own allegations (which were confirmed by the actual filings). (D.I. 24 at 12 n.6.) In the court's view, Savient never disclosed a fundamental change to the nature of its business, and the Defendants therefore had no duty to update. *See In re Burlington*, 114 F.3d at 1431; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Even treating the shift in word choice as indicative of a fundamental change, the court would still not find that the Defendants had a duty to update. The Third Circuit's discussion of the duty guides the court's analysis:

8

> We emphasize that we are *not* saying that once a fundamental change is announced the company faces a duty continuously to update the public with all material information relating to that change. Instead, we think that the duty to update, to the extent it might exist, would be a narrow one to update the public as to extreme changes in the company's originally expressed expectation of an event such as a takeover, merger, or liquidation.

*In re Burlington*, 114 F.3d at 1434 n.20. Savient's retaining of Lazard and subsequent efforts to shop the company cannot be considered an "extreme change" because such happenings were within the realm of possible actions, consistent with Savient's November 2011 announcement. "[A]lthough our Board of Directors may from time-to-time evaluate strategic alternatives available to us to maximize value, we are proceeding with our commercial launch of KRYSTEXXA in the United States . . . ." (D.I. 18, ¶ 6.) The court has quoted this statement numerous times already, but it helps to underscore the fact that Savient *never said it was giving up plans to pursue strategic alternatives*, e.g.., a sale of the company. Just the opposite—Savient's directors would evaluate alternatives *while* proceeding with launch efforts. Thus, the court sees no inconsistency, let alone an "extreme change." Johansson's theory would impose an ongoing, continuous duty to disclose all material information—this is not the law.[5] *See In re Burlington*, 114 F.3d at 1433 –34 & n.20; *see also United States v. Schiff*, 602 F.3d 152, 170 (3d Cir. 2010) ("[The duty to update] is a narrow duty because of the potential to create a sweeping continuing obligation for corporations when they disclose information.").

Because Johansson has not alleged an actionable material omission concerning Savient's strategic alternatives, his claim must fail. *See Weiner*, 129 F.3d at 315–16.

---

[5] Johansson's primary cited case is inapposite. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993). "[W]hen a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *Id.* at 268. Here, Savient consistently disclosed that it planned to launch KRYSTEXXA but also that it would consider strategic alternatives, such as a sale. In this sense, Savient always identified two distinct possible outcomes; thus, the nondisclosure could not be considered misleading. *Time Warner* is clearly distinguishable.

## 2. Scienter

Although the claim fails, the court will nonetheless briefly discuss Johansson's allegations of scienter with respect to the strategic alternatives omission. The Amended Complaint fails to adequately allege this element.

"[T]he complaint shall . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," *i.e.*, scienter.[6] 15 U.S.C. § 78u-4b(2)(a) (emphasis added). "An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Assuming that Savient had a duty to update their disclosures with the news concerning Lazard and a possible sale, the court finds that the allegations in the complaint fail to support a strong inference of scienter—that the Defendants knew or recklessly disregarded the possibility that their omission was misleading to the public. The class period filings—signed by the Defendants—disclosed that Savient's directors would "from time-to-time evaluate strategic alternatives," but they were "proceeding with [their] commercial launch of KRYSTEXXA." (D.I. 18, ¶ 7.) Johansson asserts that the fact that Savient had, at that time, already retained Lazard and was actively shopping for a buyer supports the strong inference of scienter. The court disagrees. To the court, a far more compelling inference is that reasonable investors would know alternative business strategies were potentially being pursued. The inclusion of the "from

---

[6] The Third Circuit has defined scienter in the securities fraud context as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . ." *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 667 (3d Cir. 2002) (internal citations, quotation marks, and alterations omitted).

time-to-time" caveat expressly placed the public on notice that such plans could happen at any point. Although it alleges that Savient identified numerous interested companies and even received binding purchase offers, the Amended Complaint does *not* allege that Savient had committed to sell the company while at the same time maintaining publicly that it was proceeding with its launch plans. The most plausible inference is therefore that the Defendants believed that the statements in the class period filings accurately conveyed the activities within the company. *See Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) ("Taking the facts pleaded as true and viewing them holistically, a reasonable person would not deem the inference of scienter as cogent and at least as compelling as any non-culpable inference based upon the omitted facts.").

## B. Cash Projections

In each of the class period filings, Savient disclosed that its cash holdings would fund operations at least into the second quarter of 2014: "existing cash, cash equivalents and short-term investments will be sufficient to fund our anticipated operations into the second quarter of 2014." (D.I. 18, ¶¶ 9, 10.) In its September 2013 updated plan for stand-alone restructuring, Savient projected—approximately one month after its August 2013 filing—that the company's cash could be exhausted by the first quarter of 2014. Johansson alleges that, given the short span of time between the August filing and the September updated plan, the Defendants knew that the previous cash projections in the class period were materially false or misleading at the time they were made.[7] The Defendants contend that (1) Johansson failed to adequately allege that the cash projections were false or materially misleading, (2) the projections are forward-looking

---

[7] In the Amended Complaint, Johansson alleged that the Defendants had a duty to update the cash projections after producing the September 2013 plan. (D.I. 18, ¶¶ 50–51.) Johansson appears to have abandoned this position, and in his brief, he maintains only that the cash projections were false or misleading when made. (D.I. 24 at 13–14.)

11

statements and are protected by the PSLRA safe-harbor provisions, and (3) Johansson failed to allege a strong inference of scienter.

### 1. False or Misleading Statements

The Defendants argue that Johansson impermissibly attempts to plead "fraud by hindsight." (D.I. 20 at 10 & n.3.) "To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002); *see also In re Advanta Corp.*, 180 F.3d at 538 ("Rule 10b-5 liability does not attach merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less rosy." (internal quotation marks and alterations omitted)).

The court agrees that the new cash projection articulated in the September 2013 restructuring plan is insufficient to support a plausible inference that the previous projections in the class period filings were false or misleading *when they were made* because the assumptions underlying these projections shifted. In particular, the class period filings emphasized that the projections were premised on Savient's "current commercialization plans" and "current strategy." (D.I. 18, ¶¶ 47–49.) The September 2013 updated long-term plan—discussed in the Hamill Declaration—was based on an "unprecedented new strategy." (D.I. 18, Ex. A, ¶ 30 ("Hamill Decl.").) In his brief, Johansson argues:

> Given the short period that elapsed between August 14, 2013 and the date of the updated long term plan, and the fact that Defendants had engaged Lazard to shop the Company rather than primarily focusing on the marketing and sale of KRYSTEXXA, Defendants likely were considering an updated long term plan by August 14, 2013. Thus, Defendants knew their statement about cash availability in the 2Q 2013 10-Q was untrue.

(D.I. 24 at 14.) The ultimate conclusion, however, is not plausible. The Hamill Declaration explained that, "in September 2013, [Savient's] management *produced* an updated long term

12

plan that assumed a stand-alone restructuring of [Savient] based upon the potential unprecedented new strategy." (Hamill Decl. ¶30 (emphasis added).) Thus, the very materials on which Johansson bases his allegations confirm that the new plan was not revealed until September 2013. And "with the *changes to [its] current practices* contemplated by the *new strategy*, [Savient was] projected to experience a significant short-term revenue drop... which could result in [Savient] nearly exhausting [its] cash in the first quarter of 2014." (*Id.* (emphasis added).) In other words, the Hamill Declaration explains why the cash projection looked different than those previously disclosed in the class period filings. The fact that Savient was considering an "unprecedented new strategy" at the time of the class period filings does not necessarily render the cash projections in those filings false or misleading because the filings expressly identified that the projections were grounded in the then-current strategy.[8] And Johansson does not allege that the "projections were [not] possible to achieve," under that strategy. *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 266 (3d Cir. 2009).

"[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Johansson has failed to allege facts supporting a plausible inference that the class period filings' cash projections were false or misleading *when made* because he acknowledges that the underlying assumptions were different. The Defendants correctly characterize Johansson's allegations as "compar[ing] apples to oranges." (D.I. 20 at 11.)

---

[8] Moreover, the fact that Savient did not ultimately follow through with its restructuring plants—it filed for bankruptcy instead—further underscores the implausibility of Johansson's allegations.

13

## 2. PSLRA Safe Harbor

Assuming that the cash projections in the class period filings were indeed misleading, the Defendants argue that they were forward-looking statements protected by the safe harbor provisions of the PSLRA.

> [I]n any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person ... shall *not be liable with respect to any forward-looking statement* ... if and to the extent that—
> (A) the forward-looking statement is—
>   (i) identified as a forward-looking statement, and is accompanied by *meaningful cautionary statements* identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>   (ii) *immaterial*; or
> (B) the plaintiff fails to prove that the forward-looking statement—
> . . . .
>   (ii) if made by a business entity, was—
>     (I) made by or with the approval of an executive officer of that entity; and
>     (II) made or approved by such officer with *actual knowledge by that officer that the statement was false or misleading.*

15 U.S.C. § 78u-5(c)(1) (emphasis added). As is clear from the statute, only forward-looking statements are eligible for safe harbor protection. Among the definitions outlined in the PSLRA, a forward looking statement is described as a "statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." § 78u-5(i)(1)

The parties dispute whether the cash projections were truly *projections* or *statements of present facts*. "[I]n order to determine whether a statement falls within the safe harbor, a court must examine which aspects of the statement are alleged to be false." *In re Stone & Webster,*

*Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005). "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)). As already described, the disputed statements, in one form or another, announce:

> Based on our current commercialization plans for KRYSTEXXA, including, among other things, our anticipated expenses relating to sales and marketing activities and the cost of clinical development activities directed to potential label expansion for KRYSTEXXA in the United States, and assuming that we are able to generate KRYSTEXXA revenues at the level that we are currently expecting, we believe that our existing cash, cash equivalents and short-term investments will be sufficient to fund our anticipated operations into the second quarter of 2014.

(D.I. 21, Ex. 3 at 35.)

Johansson states matter-of-factly that the "alleged falsehood is that [Savient] had sufficient cash, cash equivalents and short-term investments to maintain operations for a specified period of time. These were statements of present fact, not projections, that were false." (D.I. 24 at 16.) But the Amended Complaint alleged that "Defendants knew, or recklessly disregarded, that the . . . statements concerning [Savient]'s cash position *had become materially false and misleading* because under the Company's updated long term plan for a stand-alone restructuring . . . , [Savient] could exhaust its cash in the first quarter of 2014." (D.I. 18, ¶¶ 50 (emphasis added).) Johansson never alleged that the Defendants misrepresented that extent of cash on hand at the time of the class period filings—only that the statements proved inaccurate in light of the long-term restructuring plan. At the very least, the court is convinced that the any portion of the cash position statements relating to existing conditions, "when read in context, cannot meaningfully be distinguished from the future projection of which they are a part."

15

*Avaya*, 564 F.3d at 255. The court therefore treats the cash position projections as forward-looking statements.

   *a. Meaningful Cautionary Statements*

Proceeding with the PSLRA safe-harbor analysis, the court agrees with the Defendants that the class period filings contained meaningful cautionary language to satisfy the statutory safe harbor.

"[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Avaya*, 564 F.3d at 256 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) ("Cautionary language must be extensive, specific, and directly related to the alleged misrepresentation."). Johansson asserts that any cautionary language in the class period filings presented only vague, "boilerplate warnings" and "standard business risks," failing to give the public adequate notice that the projections may not match reality. (D.I. 24 at 17–18).

Johansson is mistaken. The class period filings were replete with "extensive and specific" warnings that Savient's solvency was at risk and that its cash projections could not be assured. *See Avaya*, 564 F.3d at 256–57. Savient made numerous statements concerning the difficulty of commercializing a pharmaceutical drug product and gaining market acceptance, and warned that, depending on the pricing and adoption of KRYSTEXXA, revenues may not reach anticipated levels. (D.I. 21, Ex. 3 at 25, 27–28; Ex. 5 at 27, 29–30; Ex. 6 at 27, 29–30.) The class period filings also emphasized Savient's need to obtain additional funding, without which

16

the company's financial condition would suffer, perhaps even causing Savient "to curtail or cease operations." (D.I. 21, Ex. 3 at 34–35; Ex. 5 at 36–37; Ex. 6 at 36–37.) Savient also specifically noted that its substantial indebtedness "may adversely affect [its] cash flow and otherwise negatively affect [its] operations." (D.I. 21, Ex. 3 at 47; Ex. 5 at 49; Ex. 6 at 49.) These warnings are far more detailed and tailored to Savient's business than Johansson's characterization. The court finds that Savient's forward looking projections satisfy the safe harbor provision of the PSLRA.

### b. *Materiality*

"A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d at 283 (internal quotation marks and alterations omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the 'total mix' of information made available." *Id.* (internal quotation marks omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Burlington*, 114 F.3d at 1426.

The parties simply dispute whether a reasonable investor would find the cash projections important. Because the court has already determined that the safe harbor applies because of meaningful cautionary language, the court need not directly address the issue. But, in light of the class period filings' meaningful warnings and other disclosures revealing the poor state of the company (*e.g.*, problems commercializing KRYSTEXXA, risk of delisting on NASDAQ

17

exchange for trading below the minimum share price, sharply declining cash holdings), the court expresses serious doubt that the cash projections contained material information. *See EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000) ("Under the 'bespeaks caution' doctrine, cautionary language, if sufficient, renders the alleged omissions or misrepresentations *immaterial as a matter of law*." (emphasis added) (internal quotation marks omitted)).

### c. Knowledge of Falsity

The PSLRA safe harbor also protects forward-looking statements if the person who made the statements did not know that the statements were false or misleading. This analysis overlaps with that of scienter (as a distinct element of a securities fraud claim), and therefore the court will address the Defendants' knowledge in its final discussion of scienter (as the parties themselves also did).

### 3. Scienter

The court has already explained why the cash projections in the class period filings were not false or misleading, and, if they were, why the PSLRA's safe harbor provisions would shield the Defendants from liability. Notwithstanding those determinations, the court will briefly discuss whether Johansson's allegations support a strong inference of scienter for each of the Defendants. 15 U.S.C. § 78u-4b(2)(a). The court finds that the alleged facts fail to satisfy the standard outlined in the U.S. Supreme Court's *Tellabs* decision. *See Tellabs*, 551 U.S. at 314 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

Johansson alleges that the Defendants knew that the cash projections in the class period filings were false because they were in "receipt of information reflecting Savient's cash position under the Company's September 2013 updated long term plan for a stand-alone restructuring of

18

Savient, completed in September 2013." (D.I. 18, ¶ 63.) This allegation is self-defeating—how can a plan that was not *completed* until September 2013 support an inference that projections made weeks, if not months, earlier were knowingly false? A much more plausible inference is simply that the Defendants updated their cash projections after fully considering the unprecedented new strategy in September 2013, but that the Defendants fully believed the veracity of the previous projections at the time they were made. Moreover, as discussed previously, Savient made its September 2013 projection under a completely differing set of assumptions—in the court's view, the most plausible inference is that the Defendants did not *know* the original projections were misleading because they had applied different variables to generate them and had disclosed those assumptions to the public. The court rejects Johansson's assertion that the September 2013 updated projection provides a strong inference of scienter. *See Winer Family Trust*, 503 F.3d at 328 (affirming the District Court's holding that "the most plausible inference from Winer's alleged sequence of facts was that Pennexx revised its preliminary cost estimates as it learned more about the costs of renovating").

Johansson also contends that all of the Defendants signed at least one of the class period filings, thus supporting a strong inference of scienter. The court is not convinced that signing an SEC filing alone, without additional allegations of knowledge or intent, is sufficient to give rise to a *strong inference* of scienter. The *Tellabs* decision requires courts to consider alternative, non-culpable inferences. *Tellabs*, 551 U.S. at 314. An inference of scienter based on signatures and identifying the Defendants' positions within Savient is not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See id.*

Johansson has failed to allege a strong inference that the Defendants acted with scienter.[9]

---

[9] Johansson made two additional statements in his briefing concerning two specific defendants: "In the Hamill Declaration, he confirmed that he had been aware of a number of facts inconsistent with the documents that

19

## V. CONCLUSION

Johansson has failed to state a claim under the PSLRA. He does not allege an actionable misrepresentation or omission, nor does he allege facts giving rise to the requisite "strong inference" that the Defendants acted with scienter. For all of the foregoing reasons, the court will grant the Defendants' Motion to Dismiss. (D.I. 19.)

Dated: August 20, 2015

_____
UNITED STATES DISTRICT JUDGE

---

he executed." (D.I. 24 at 20.) "This case... does not involve fraud by hindsight given Jaeger's affirmative comments indicating that Defendants knew that certain financial information available to the market was inaccurate." (*Id.* at 23 n.10.) To the extent that it follows Johansson's reasoning, the court disagrees. Nothing in the Hamill Declaration or an October 2013 press release issued by Jaeger supports a strong inference that the Defendants knew the previous cash projections were false at the time they were made.